## In re Deleglise.

*November 28—December 13, 1907.*

*Guardianship: Incompetent persons: Evidence: Opinions: Experts.*

1. In proceedings for the appointment of a guardian for an incompetent person, the evidence, stated in the opinion, is *held* to sustain an order making such appointment.
2. The mental incapacity described by the statute, authorizing the appointment of a guardian of an incompetent person, relates more to the competence of the person with reference to the care and conservation of property, and the care of health and person, than it does to insane hallucinations.
3. On the question of mental incapacity the opinions of experts, who form their opinion from a single interview had for the purpose of qualifying as witnesses, are necessarily weak and inconclusive when opposed by facts in conflict therewith.

In re Deleglise, 134 Wis. 41.

APPEALS from a judgment of the circuit court for Langlade county: GEO. W. BURNELL, Judge. *Reversed on both appeals.*

*Edward Cleary,* appointed general guardian of the person and estate of Mary Deleglise by the county court of Langlade county under sec. 3976, Stats. (1898), appeals from a judgment of the circuit court for Langlade county reversing the order of the county court appointing him such guardian, and the petitioners in the county court, *Anna E. Morrissey* and *Sophia E. Leslie,* appeal from that part of the same judgment imposing the costs of the guardianship proceedings upon said petitioners.

For the appellants there was a brief by *T. W. Hogan* and *H. F. Morson,* and oral argument by *Mr. Hogan.*

For the respondent there was a brief by *Goodrick & Goodrick,* and oral argument by *E. J. Goodrick.*

TIMLIN, J. Giving full force and effect to the decision of this court in *In re Streiff,* 119 Wis. 566, 97 N. W. 189, and that in *In re Welch,* 108 Wis. 387, 84 N. W. 550, and having in mind the rule that the findings of fact of the court below will not be reversed in this court unless contrary to the clear weight of proof (*Cunningham v. Brown,* 44 Wis. 72; *Catura v. Kleiner,* 95 Wis. 378, 70 N. W. 479; *Clausen v. Hale,* 96 Wis. 100, 71 N. W. 122; *Momsen v. Plankinton,* 96 Wis. 166, 71 N. W. 98), we proceed to the consideration of the questions raised on this appeal.

Mary Deleglise is about seventy-three years of age, and with her husband, F. A. Deleglise, came to Antigo in 1877 practically without means, their whole property consisting of about $300 in cash belonging to Mary Deleglise. She was the mother of nine children, six of whom are still living. At least three of these nine children were feeble-minded. During her husband's life she never took part in the conduct of the business or in the acquisition of the property. Mr. Dele-

glise died in March, 1894, and after coming to Antigo and up to that time had accumulated considerable property. He had failed in business some years before coming to Antigo and was in debt, and all the property he thereafter accumulated up to the time of his death was carried in the name of his wife. No inventory of this property was made until about 1897, when the petitioner *Mrs. Morrissey,* who is a daughter of F. A. and Mary Deleglise and who had been keeping books for her father since about 1886 and up to the time of his death and after his death and until late in the year 1897, in 1897 made an inventory of the property so acquired, and it amounted to about $75,000 with debts of about $10,000, mostly secured by real-estate mortgages. For several years prior to the death of F. A. Deleglise his son-in-law, Mr. Leslie, and husband of the petitioner *Sophia E.,* assisted him in his office. Mr. Leslie was discharged by Mary Deleglise in the fall of 1894. After *Mrs. Morrissey* left the office and bookkeeping in November, 1897, Mary Deleglise placed her two sons, Alex and Adelbert, in charge, and they continued to run the office and manage the property from November, 1897, until March, 1903, when Mary Deleglise discharged them and placed her daughter, *Mrs. Leslie,* in charge, who managed the office until October, 1905, when she was discharged by Mrs. Deleglise, who then placed Adelbert again in charge. The inventory, which appears to have been quite specific, made in November, 1897, contained about 100 forty-acre tracts of land, 450 city lots, and some acreage adjoining the city of Antigo not platted, all in the name of Mary Deleglise. At present Mrs. Deleglise owns thirteen and one-half forty-acre tracts and 103 city lots, and about 150 acres of land in all about the city. The rest has been sold by Alex and Adelbert and *Mrs. Leslie* during the time they were managing the property or was included in the division and distribution among the children hereinafter mentioned. A writing showing this division or distribution

was offered in evidence, and for some unaccountable reason rejected as incompetent, irrelevant, and immaterial. A writing offered showing sales of lands made from October, 1897, to March, 1903, was rejected for a similar reason. After the division of property and distribution amongst the children Mary Deleglise had real estate to the amount of $55,000, with debts of from $6,000 to $8,000, which debts are still outstanding and unpaid. During the time that Alex and Adelbert were in charge, from 1897 to 1903, they took in from the sales of lands at least $43,000, but they did not keep books so that this could be ascertained with exactness. Their manner of keeping accounts was such that it was almost impossible to tell what money they received and what lands they sold belonging to Mary Deleglise. Mrs. Deleglise does not know anything about it and she could give no information on the subject. Alex has left Antigo and is out West somewhere. Mrs. Doersch, one of the daughters, who is living apart from her husband and who is somewhat weak-minded, occupies the same house with her mother at present. Adelbert is in charge of the property under his last appointment, and *Mrs. Morrissey* and *Mrs. Leslie* are the petitioners in this proceeding.

*Mrs. Morrissey* testifies that her mother had trouble with *Mrs. Leslie* and trouble with all of them. She wished a guardian so that the property be properly administered and because she did not want to see her mother on the town in a few years, and she did not believe Adelbert was very honest and considered her mother very feeble-minded. Describing her mother's condition she testified that Mary Deleglise cannot think of the management of her household for even one day; that she could not provide for herself; that her mother lived like a pauper; and that she surely did not spend the $43,000 gotten from the sale of lands and that it has gone somewhere, and that *Mrs. Leslie* found lots of taxes unpaid after Alex and Adelbert went out. Her mother gave $5,000

to the Bohemian Church as John's share of the estate, John being dead. Four thousand dollars of this was given in a promissory note which she afterward paid. She gave away lots and had them raffled, has given away money to poor children, and spends a great deal of money but gets little for it. Instead of being economical and frugal she is wasteful and lives in poverty and has nothing to eat sometimes. She wanted to give the church another $5,000 which she claimed to be the share of Edmund, the weak-minded son who is still living. Since these proceedings started she has given Mrs. Doersch $10,000 or $12,000 worth of property. The witness describes her mother as living in poverty, her house in general disorder; hard for her to let them get her the actual necessaries of life; does not take care of her bedroom and has not for years been able to take care of it herself, but locks her bedroom up when she leaves it and keeps the key. There are old clothes there which have been there for years and are worm-eaten. When they brought her dainties or oranges she would put them away and not eat them or let any one else eat them, and they would afterward find them decayed where she had hidden them. She also hides money. She goes around upon cold nights in her nightgown. She sits by her table and broods over business affairs and she cannot grasp them, and they seem to be such a heavy burden on her shoulders, and she cannot understand them and makes complaints. She has accused different doctors that have been to see her of trying to poison her, and accused the physician that attended Mr. Deleglise of poisoning him. She is superstitious—thinks she is bewitched by Mrs. Novak. She associates or has associated with one Mrs. Hammond, a fortune teller, and she knows nothing about the transactions of her agents with her property.

The other daughter, *Mrs. Leslie,* corroborates this evidence, and adds some further particulars. She took possession of the office March 1, 1903, at request of her mother, who was

then dissatisfied with the way that Alex and Adelbert were running things. There was considerable discussion then about applying for the appointment of a guardian. This witness describes that she found that the books had not been kept up, sales of her mother's lands of which no record at all had been kept, and a chaotic condition generally. In order to ascertain what had been done with her mother's property she went to the register of deeds and had him make out a grantor and grantee index of all the sales from November 30, 1897, to March, 1903. Using this index she wrote to parties that seemed to be owing, asking them to bring in their receipts, contracts, and papers which they were holding on the property. Quite a number of them came in, but those that had deeds did not show up. In this method she got the sales book partly straightened out again and found, as before stated, thirteen and one-half forty-acre tracts unsold, an undivided interest in one forty-acre tract, and the lots and property before mentioned. At the time of this witness giving her testimony there were ninety-six lots left, thirteen and one-half forty-acre tracts, and about 148 acres of other land. The indebtedness of her mother was not substantially decreased during this time. She found a great many taxes unpaid and some tax certificates in the office, some of which were outlawed and some were tax certificates upon the lands of others. After finding that Alex and Adelbert had received upwards of $43,000 she asked Alex what he had done with the money and he said he blew in $10,000. She describes her mother's condition, testified that her mother does not know the value of any of her property, and whenever witness got ready to sell a piece of property her mother always signed the deed and took her word for it and let it go. Mary Deleglise has given away much of her property since the death of Mr. Deleglise. In the language of the witness, "She gave a house and lot to Mrs. Zitz and also to Mr. Gallinger and also to Mrs. Close." Her mother is easily influenced by people coming to

her and working on her sympathy. She has given consider-able money to charitable institutions also, describing that heretofore mentioned, also the gift to Mrs. Doersch.

With reference to her manner of living, witness says that she went over in the fall of 1903 and stayed with her mother about a year and a half. Her mother was sick at the time and witness went to take care of her. She goes around in rags in her bare feet any kind of weather, winter or summer, is very miserly in regard to her table, would not buy enough of the necessaries of life, has not any method of keeping her rooms; her bedroom is a storage room, you might call it; keeps weeds and herbs there, and the room is unclean, and her mother is not able to take care of her own bed; keeps eatables in her room until they spoil; forgets where she puts her money and thinks some one steals it. After she signs a deed or contract she would not remember the next day what she signed; is superstitious and a believer in witchcraft and in communications from the angels. When a note was due in the bank and witness informed her mother about it, her mother denied that she ever signed such a note. Upon being shown her signature she said she must have signed it. It was a common occurrence of hers to sign papers and then deny her signature in other transactions. The total amount that appears on the sales book during the administration of Alex and Adelbert as moneys received from sales is $26,595.22, while the amount shown by the record sales is $43,000. Mrs. Deleglise is now desirous of giving an additional $5,000 to the church, and among her gifts enumerated by this witness are a house and two lots to John Six, something to John Bergert, a house and two lots to Gallenberger, giving rent of her houses for years to families and charging them no rent, forgiving John Gibson the balance on his purchase, and donating to Mrs. Close three lots. Also purposes to donate to a public park to be called Deleglise Park. She is bringing up a number of orphan children and Indian

children and she associates with paupers and poor people. When the guardian was appointed she had a balance to her credit in the Langlade National Bank of only $78.20; nothing in the other bank.

Dr. Doyle, who knew her about twenty years and treated her on two or three different occasions and had frequent conversations with her and some experience in business matters, considered her of weak mind and generally mentally incompetent to transact business of any description. Dr. Watson, who had known her for four years and had treated her professionally and had opportunities to see her and converse with her, considered her incompetent to handle an estate of any large amount. Dr. Donahue, who had known her about twenty-two years and who had been to her house on professional services and treated her and other members of the family and had conversations with her during that time, did not consider her competent to look after ordinary household affairs nor to manage a large estate. A hypothetical question was put to some of these experts which described a supposititious case unlike the case of Mary Deleglise, and then asked whether the expert would consider such a person an imbecile, and to this the expert answered "No." To meet this evidence the defendant called two physicians, Dr. Russell and Dr. Kempster, who, for the purpose of informing themselves, had a single interview with Mary Deleglise, and as a result of that interview Dr. Russell's opinion was that it would be improper to call Mary Deleglise into court to attend the trial of a case in which she was so much interested, that he found no symptoms of insanity or imbecility or dementia or breaking down of the mental faculties, and then answered the following question: "Q. State whether in your opinion she is mentally competent to conduct the ordinary affairs of life and having charge of her affairs and her own person." To which he answered, "I should say she was, as much as a person of her age." Dr. Kempster, who qualified as a specialist in mental

and nervous disorders and who visited Mrs. Deleglise for the purpose of examining her condition mentally with a view to testifying in this case, considered her too weak physically to attend the trial and submit to an examination such as is ordinarily required in court, and described the impression she made on him at this interview had for that purpose and found her memory keen and clear on some incidents of which he had personal knowledge; found her memory good:

"Her memory I found to be excellent. Her judgment was good. Her reasoning was above the average for a person of her education and years. . . . I discovered no evidence of insanity of any kind or of any nature or of any degree and did not discover a particle of evidence of senile dementia."

On cross-examination he said:

"I would not consider her at that time [referring to the time of taking the first inventory] more able mentally and physically to look after her business than at the present time. I understand that she is weaker now physically than she was then, but I do not understand she is mentally weaker."

Mrs. Eliza Kayne, who lived in Antigo, knew Mary Deleglise quite intimately prior to the last ten years, but during that time had been to Deleglise's only in sickness, except to call once or twice a year. She never saw anything in Mrs. Deleglise to lead her to think she was an imbecile or insane or anything near it, but she knew nothing about Mrs. Deleglise's property, or the extent of it, or how it was managed. Mrs. Mary Neff, a woman who knew Mary Deleglise about twenty-four years and saw her during the last number of years, testified that she was about the same mentally as she was twenty years ago, and she did not consider her insane or an imbecile, and that she was as competent today mentally to take care of herself and business as she ever was. She was at Mrs. Deleglise's house once or twice and found everything in good order. H. A. Kohl was a hardware merchant living in Antigo and had known Mrs. Deleglise a long time, and did

not notice any change in her mental condition during the time he had known her; that she was in his opinion as mentally competent now to take care of herself and her property as she ever was, except her age might be a little against her. Her mind is just as good as it ever was. Mamie Osceliski, one of the children brought up by Mrs. Deleglise, now twenty-two years of age, and who had lived with her since she could remember, testified that she is sick more than she used to be and is more feeble bodily, but her mind is the same so far as witness has seen her, and her memory is as good as it has been. John Hessel, who lives in Antigo and is in the hardware business, knew Mary Deleglise about twenty years, and he did not notice anything in her conduct a few days ago any different from what she has always been mentally, and had never seen anything about her which would lead him to think she was mentally incompetent at any time. Upon being asked whether he meant that she was capable of transacting her business he answered that she never transacted any that he knew of, but that it is the impression generally among the inhabitants of Antigo that she is mentally incompetent to transact her own business and take care of her own affairs. The member of her family who is in charge of the property and who is resisting this appointment of a guardian, Adelbert Deleglise, testified as follows:

"*Q*. Did you tell Mr. Church, the treasurer of the county, last October that if the girls hadn't made application to have your mother put under guardianship that you would? *A*. It can't be answered by 'yes' or 'no' in justice to myself. I told him that such a thing had occurred to me when the state of Mrs. Deleglise's estate depreciated and gone down to such an extent as to leave herself liable to be dependent on those whom she wanted to help and give a livelihood."

George Hill, the mayor of the city of Antigo, knew Mary Deleglise, and during his acquaintance with her never noticed anything in her conduct to indicate that she was mentally incompetent.

In re Deleglise, 134 Wis. 41.

From this *résumé* of the testimony it must appear that the acts, facts, and circumstances regarding the attitude of Mary Deleglise toward her property and toward the members of her family and her mode of living and her hallucinations or beliefs and the wasting of the property by improvident management by giving it away and making gifts far beyond what her present apparent means would warrant, and her lack of any adequate or of any considerable knowledge of what property she has or how it is being managed or what is being done with it, are all substantially undisputed. The mental incapacity described by this statute relates more to the competence of the person with reference to the care and conservation of property, and the care of her own health and person, than it does to insane hallucinations, which are often consistent with thrift and industry. The opinions of experts, especially of those who form their opinion from a single interview had for the purpose of qualifying them as witnesses, are necessarily very weak and inconclusive evidence upon such a question. They do not necessarily gain in probative force because of positive or dogmatic form of expression. The opinions of other witnesses called for the defense, while entitled to some weight as opinions, are weakened by the fact that the witnesses are disposed to compare Mary Deleglise's present condition with her former condition. The testimony tends strongly in the direction that she was always more or less weak-minded, but the opinion evidence should not have been allowed to prevail against the undisputed facts and circumstances concerning the mode of living of Mary Deleglise, the manner of taking care of her person, and the fact that through her incapacity and lack of knowledge her property is actually being squandered and wasted both by herself and by those whom she left in charge of it. It is not a case where there is a conflict upon the facts last referred to, but where the conflict is only upon the opinion evidence. On the one side the expert opinion evidence is furnished by gentlemen who have

known Mary Deleglise a great number of years and have had occasion to observe her condition and her doings with respect to her person and property; on the other side, by gentlemen who examined her upon a single occasion and attempt to decide the question of her mental competency from such examination alone.   We believe the judgment of the circuit court was contrary to the great preponderance of the evidence, judging it according to its real probative value, which chiefly lies in the opportunity of the witness for information and knowledge, and in the undisputed evidence of facts and circumstances regarding her mental attitude toward her property and her person.   It follows that the judgment of the circuit court must be reversed upon both appeals, with one bill of costs in this court to be taxed and paid by the guardian out of the trust funds in his hands.

*By the Court.*—The judgment of the circuit court is reversed on both appeals, with costs as in this opinion directed, and remanded to the circuit court with directions to affirm the decree or order of the county court; also with taxable costs to be paid out of the estate of the ward.